Somerville vs. Brown.—1847.

REBECCA SOMERVILLE vs. DAVID U. BROWN.—*December*, 1847.

In October, 1841, R. being indebted to a firm, of which C. was a partner, gave her notes, at his request, dated 1st November, 1841, payable in instalments at from one to five years, for the amount of the debt. One of those notes C. transferred to *A.* by way of security, and when it fell due R. gave her renewal note for a part of the same, also dated 1st November, payable in two years and six months, and due 1st May, 1844, to W., the brother of C., who endorsed it to the plaintiff. The time of that transfer did not appear. In an attachment commenced by a creditor of the firm, on the 10th January, 1842, against R. and *T.* as garnishees of C. survivor of such firm, judgment of condemnation was rendered in January, 1843, of said renewal note, in favor of the attaching creditor. On the 14th June, 1842, C. applied for the benefit of the insolvent laws of *Maryland,* and there was evidence tending to prove that he was *then* the holder of the said renewed note. *Held,* that if the jury believed that C., when the attachment was issued, or when he applied for relief under the insolvent laws, was the holder of the said renewed note, then the endorsee of W. was not entitled to recover its amount from R.

An attachment laid in the hands of the maker of a promissory note, as garnishee, for the debt of an endorsee then being the owner and holder of the note, followed by a judgment of condemnation on the attachment, will protect the maker, garnishee, in a subsequent action, brought on the same note, by a subsequent endorser receiving the note without notice.

In a case of *first impression,* depending on a statute, of which the language was capable of a construction which might avoid embarrassment to the commercial, or any other portion of the community, the argument of inconvenience would justly have controlling influence. The act of 1796, ch. 56, in terms declares that a creditor, on certain conditions, may attach the lands, tenements, goods, chattels and credits of his debtor, speaks also of the liability of " a garnishee who is indebted in any sum of money," and is in this respect but a repetition of the act of 1715, by which an attachment was authorized against all goods, chattels and credits in the hands of any person whatever, and consequently authorizes the attachment of a debt due on a promissory note before its maturity in the hands of the maker, while the debtor continued the owner and holder of the note.

Our whole system regulating the relation of debtor and creditor, is designed to subject every dollar's worth of property, real, personal and mixed, to the just claims of a creditor, and so exempt the honest debtor who does surrender all such property, from the grasp of a relentless creditor, who might desire to imprison his person, or weigh down his future energies by the impending burthen of his debt.

Inconvenience alone will not induce the court to construe an act, directly in violation of its plain language and apparent design.

Somerville *vs.* Brown.—1847.

If the debt due on a negotiable note could not properly be the subject of an attachment until after its maturity, still, if the maker of the note, in a contest, in such a case, fairly resisted, has been adjudged by a court of competent jurisdiction, to pay such a debt to an attaching creditor of the holder of the note, such maker would find a defence in such a judgment of condemnation, and not be adjudged to pay the same debt twice.

The insolvency of the holder of a note or bill of exchange, passes the title thereto to his trustee, and disables the insolvent from conveying an interest in the bill or note, after the date of his personal discharge, and before its maturity, even to an endorsee without notice of his insolvency.

APPEAL from *Baltimore* County Court.

This was an action of *assumpsit* docketed by consent to November term, 1844, by the appellee against the appellant. The declaration contained the common counts, to which the defendants pleaded the general issue. The verdict and judgment were for the plaintiff.

At the trial of the cause, the plaintiff proved the following note of the defendant.

"*Baltimore*, 1st Nov'r, 1841.

$822 19. Two years and six months after date, I promise to pay *W. T. Somerville*, or order, eight hundred and twenty-two dollars and nineteen cents, for value received.

*R. Somerville.*"

And the endorsement thereon—

"Pay *David U. Brown. W. T. Somerville.*"

The defendant then to support the issue on her part, proved the following attachment in *Baltimore* county court, and judgment therein.

The *Bank of New Orleans vs. Rebecca Somerville* and *Tiernan Somerville,* garnishees of *Charles Tiernan,* surviving partner of *Luke Tiernan.*

Att'd on judg't, 10th Jan. 1842, app. for garns, rule plea, 18th March, 1842, plea *nulla bona* and notice to reply filed, rule rep. same day service of copy and notice of rule admitted, same day gen. rep. fd. service of copy admitted. Continued to May term. Continued to September term. Continued to January term, 1843.

27th *January*, 1843. Jury sworn. Verdict for plaintiff. Damages $10,000. Judgment of condemnation on verdict against garnishees for $10,000, with interest from 27th January, 1843, subject to agreement, filed. This judgment to be released on payment of $500 on 1st May, 1843, of $500 on 1st November, 1843, of $822 19 on 1st May, 1844, of $1,000 on 1st November, 1844, of $1,000 on 1st November, 1845, of $1,000 on the 1st November, 1846, and of $2,000 on 1st November, 1847, with a stay on the several amounts as they become due, terms filed.

The defendant also offered in evidence the application of the said *Charles Tiernan* as an insolvent debtor, for relief, to the commissioners of insolvent debtors for the city and county of *Baltimore*, on the 14th June, 1842, the proceedings thereunder, the appointment and binding of his permanent trustee, and his final discharge from his debts and creditors, dated 17th November, 1842, with a variety of schedules, showing said insolvent's debts and credits at the time of his aforesaid application.

The defendant also proved that the debt now sought to be recovered was part of the debt stated in said schedule.

The plaintiff then offered *Charles Tiernan* as a witness, who was admitted subject to exceptions, and he proved that in October, 1841, he came to a settlement with *Mrs. Somerville*, the drawer of a note due to *L. Tiernan & Sons*, and then (in October) took her notes for five thousand dollars, payable annually from 1st November, 1841, for five years, in the sums of $1,000 each ; that the first of these notes, sometime before, he transferred to his brother *William* to secure a debt of $453 due him, and a sum due *Mr. Cooney*, and $150 due by deponent to *John Nelson, Esq.* as a fee, which when said note fell due, was paid by *Tiernan Somerville* to said *Nelson*, and this note is a renewal in part of that $1,000 note, though dated 1st November, 1841, and that the other of said notes were passed to *Thomas Penny.*

The defendant then gave in evidence, that *A. W. Bradford, Esq.* appeared to said attachment by direction of *Charles Tier-*

*nan*, and did not remember being told by him that he had passed away said notes, although he might have said so.   That he, *Tiernan*, did set up as a defence that the notes were given to him in a different character from that in which the attachment was levied.   Defendant also proved that *Penny* was agent of *Luke Tiernan* during his lifetime, and now has charge of the business of *Tiernan, Cuddy & Co.* and *W. H. Tiernan*, deponent's brother.

1. The defendant prayed the court that said *Charles Tiernan* was not a competent witness in this case.

2. If the jury believe that *Charles Tiernan*, at the time when the attachment was issued, and when he applied for the insolvent laws, was the holder of the note now in suit, then plaintiff is not entitled to recover in this cause.   Which opinions and directions the court (ARCHER, C. J., PURVIANCE and LE GRAND, A. J.,) refused to give.   The defendant excepted.

The defendant appealed to this court.

The cause was argued before DORSEY, CHAMBERS, MAGRUDER and MARTIN, J.

By McMAHON for the appellant, and

By DAVID STEWART and C. F. MAYER for the appellee.

DORSEY, J., delivered the following dissenting opinion.

The correctness of the court's decision in overruling the appellant's objection to the testimony of *Charles Tiernan*, being conceded, the only remaining inquiry is, did the county court err in refusing to grant the appellant's second prayer, " that if the jury believe that *Charles Tiernan* at the time when this attachment was issued, and when he applied for the insolvent laws, was the holder of the note now in suit, then the plaintiff is not entitled to recover in this cause."

To prove the appellant's right to the instruction denied to him by the court, it has been broadly asserted, (and the assertion backed by an elaborate argument) that if an attachment be laid in the hands of the maker of a promissory note endorsed in

blank, and yet undue, to bind the interests of a holder thereof for a debt due by him to the plaintiff in the attachment, and the note be subsequently, and before its maturity, negotiated or sold by the holder to a third person in the due course of business, *bona fide*, for a valuable consideration, and without notice, that the plaintiff in the attachment is entitled under that proceeding to recover from the maker the amount of the note, and that by such transfer the third person thus holding the note, acquired no right of action against the maker thereof. And this doctrine, as I humbly conceive, so utterly inconsistent with all the principles of the law-merchant, as to bills of exchange and promissory notes, which law-merchant exists to as full an extent in *Maryland* as in *England*, is ascribed to the alleged true construction of the 1st section of the act of Assembly of 1795, chapter 56, which authorizes the levying of an attachment as well upon the the "credits of the debtor, as upon his lands, tenements, goods and chattels."

There is nothing in the language of this act of Assembly, or in the evils it was designed to remedy, or in the object sought to be accomplished by it, which should conduct us to the conclusion, that it was the intent of the Legislature to effect so impolitic and inconvenient an innovation upon the mercantile law and usages of the State; to interpose an obstacle to its commercial prosperity, so unwise and so uncalled for. Full import and meaning may be given to every word and expression in this act of Assembly, without imputing to the General Assembly that suicidal intent attempted to be imposed upon their act. If it were the design of the Legislature to change and repeal, to the extent ascribed to it, the law-merchant, as to the protection thrown around *bona fide* transferees for value of bills of exchange and promissory notes, no sound reason can be assigned, why all similar protection should not be wholly withdrawn from them, and commerce be deprived of those facilities and safeguards which commercial wisdom and experience have for ages cast around it as essential and indispensable to its prosperity.

And why is it, that this construction of the act of 1795, so disastrous to commerce and the best interests of the State is to

be resorted to? Because the credits, as well as the goods and chattels of the debtor, are made liable to an attachment. Does the term "credits," as thus used in the act of Assembly, in any degree warrant the enlarged and forced construction attempted to be given to it? I humbly conceive that it does not. The term "credits," when applied to the case before us, means the right which the debtor-holder of the note had to recover its amount from the maker. What was the nature of that right? Was it an absolute, unqualified engagement of the maker to pay the amount of the note to *Charles Tiernan*, without reference to future events or contingencies? Unquestionably not. By the endorsement of the note in blank, though it might be held by *Charles Tiernan*, it was not an unqualified promise of the maker to pay the note to him, whether at its maturity, he should remain the holder therefor or not; but undeniably the promise was, as well in fact, as in contemplation of law, to pay the note to the bearer; or to him, who, at its maturity should be the *bona fide* holder thereof. Can it then be contended for a moment that the service of the attachment in this case entirely changed the contract of the parties, and converted an agreement theretofore, contingent and conditional, into one, that was certain and unqualified? The act of 1795, applied as well to contracts existing at its date, as to those subsequently entered into: to give it then the construction insisted on by the appellant, would be to impute to the Legislature in its passage an intention to impair the obligation of contracts, and violate the Constitution of the *United States*. An imputation which no court of justice should make, but from cogent necessity; and according to the best consideration I have been enabled to give the subject, could not be otherwise than gratuitously made on the present occasion.

In rendering credits the subject of attachment, all that the Legislature designed to effect thereby, in a case like the present, was to substitute, as it were, the attaching creditor to the rights of his debtor-creditor; and to enable the former to recover that which the latter would have been entitled to recover, had no attachment been issued. It did not mean to change the

nature of the credit, and to withdraw it from the operation of the law-merchant, the law of the land, and to give to the attaching creditor rights which would have been denied to the debtor-creditor, had no attachment have issued. It gave no higher or superior rights to the credit, to the attaching creditor, than those that would have belonged to the debtor-creditor, had no attachment intervened.

The design of the act of Assembly was simply to provide the means by which the attaching creditor could as effectually recover the credit as could the debtor-creditor, had no attachment been interposed. In conferring on the attaching creditor the power with which he was invested, by the act of Assembly, the Legislature never dreamed that they were repealing any part of the law-merchant in relation to bills of exchange or promissory notes ; or that they were investing him with rights and powers superior to those which he would have possessed had a *bona fide,* absolute transfer and delivery of the promissory note been made to him by his debtor-creditor. For such a discrimination by the Legislature, no conceivable motive or reason can be assigned. Nay, so far from greater or superior rights being transferred to the creditor, in the former, than in the latter case, he is clothed with diminished and inferior rights. In his recovery of the credit, he would be subject to all the discounts, setts off, pleas in bar, and defences of which the maker of the note could avail himself, if the action on the note were prosecuted by the debtor-creditor himself; whereas, in the latter case, he would be exempt from all such defences.

It may be said that such a construction of the attachment laws would leave it in the power of the creditor-debtor, the holder of a promissory note endorsed in blank, to evade the effect of the attachment by making, to a person not notified of the attachment, a *bona fide* transfer and delivery of the note. To such a contingent defeat of all benefit from his process is an attaching creditor exposed. But that exposure is nothing more than a qualification or restriction incident to the rights acquired under the attachment; and imposed upon them by the law-merchant for the benefit of commerce, for the good of the

public. It does him no wrong; it deprives him of no right; it but qualifies the favors which the law confers upon him. It is an implied qualification of such favors that is indispensable or necessary to the prosperity of commerce and the interests of the community. Not to make such an implication would be to annihilate the negotiability of promissory notes and bills of exchange, or to authorize by legislation the practice of frauds upon the public. Neither of which results can, upon any principle of sound construction, be regarded as having entered into the contemplation of the Legislature in the passage of the act of 1795. The only mode by which the attaching creditor can protect himself against the transfer of the note by his creditor-debtor is through the auxiliary interposition of a court of equity in aid of his proceedings at law.

Of the effects of the law-merchant upon his rights the attaching creditor has infinitely less cause to complain than has the owner of a promissory note endorsed in blank, which being before its maturity withdrawn from his possession, forcibly, fraudulently, surreptitiously or feloniously, is passed as aforementioned to a *bona fide* transferree. In any such case the *bona fide* transferree becomes the absolute proprietor of the note, and holds it discharged of all claim by the original and rightful owner.

It has also been contended that the pendency in *Baltimore* county court of the attachment suit, by the *Bank of New Orleans* against *Charles Tiernan*, which was laid in the hands of *Rebecca Somerville*, is a *lis pendens*, of which the appellee was bound to take notice, and from which the law imputes to him a knowledge of the fact, that a condemnation of the amount due on the note in question was sought by that suit. Without relying upon the principles that according to the law-merchant to such a transferree no knowledge of a *lis pendens* is to be imputed, even though its examination would establish the knowledge imputed; let us see whether the *lis pendens* in this case, if known to the appellee, could form a sufficient basis for the alleged imputation of knowledge. The proceedings in the attachment by the *Bank of New Orleans*

against *Charles Tiernan*, as laid in the hands of his gar-
nishees, *Rebecca* and *Tiernan Somerville*, disclosed the facts
that the plaintiff claimed of *Charles Tiernan* some $10,000,
and that he sought a condemnation for that amount of the rights
and credits of *Charles Tiernan* in the hands of his gar-
nishees. But did that, if known to the appellee, communicate
to him the fact, that the note in question constituted any part of
such rights or credits, or that *Charles Tiernan* had ever
owned, seen or heard of it? Against the claim of the appel-
lee, therefore, the appellant in such a defence can obtain no
protection.

Another ground upon which the appellant urges her right to
have obtained from the county court the instruction required
by her second prayer, is, that the note having been in the pos-
session of *Charles Tiernan* at the time of his application for
the benefit of the insolvent laws of this State, the title thereto
passed to his trustee by operation of law, and that no interest
in or title to the note could be acquired by any body but by a
tranfer from such trustee. There is nothing by which such a
position can be sustained. In making the legislative transfer
mentioned, there is nothing to induce a momentary belief that
the Legislature contemplated any innovation in the law-merchant,
as to the means by which a title to negotiable paper might be
acquired. The design of the law was simply to invest the
trustee with the same title to the property of the petitioner that
he would have acquired under a formal deed of conveyance.
The property of the insolvent when thus cast upon the trustee
had no peculiar safeguards around it for its especial protection;
but in his hands was subject to all the casualties and incidents
to which like property was exposed when owned by any other
person.

Having thus far examined this case with reference to the
general principles of law applicable to it, and to the true con-
struction of the act of Assembly under which it arises, I shall
now proceed to the consideration of the judicial determinations
upon the subject, by which it is alleged, that it is conclusively
shewn, that the county court erred in refusing to instruct the

jury that the plaintiff below was not entitled to recover. These adjudications, it is asserted, unanswerably prove, that the service of an attachment issued against the holder of a promissory note before it is due, endorsed in blank, upon the maker thereof, puts an end, as far as the attachment is concerned, to the negotiability of the note: and that its subsequent transfer to a third person before it becomes due *bona fide,* for a valuable consideration in the due course of business, and without any notice of such attachment, passes no title to the note, but in subjection to the attachment. Before the court could have granted the prayer, it must have assumed the truth of all the above facts, as respects the transfer of the note to the appellee, because there was evidence before the jury, from which they were authorized to have found them.

The first authority cited, and which has been pressed upon this court as decisive, in favor of the appellant, of what is the law in Maryland on the question before us, is the case of *Stewart vs. West,* garnishee of *Jenners,* reported in 1 *Har. & John.* 536. But that case, when attentively considered, is entitled to no such effect as has been imputed to it; and is in perfect consistency with the judgment rendered in this case by the county court. That I may not be misconceived in the views I entertain, in the case presented by the record before us, I deem it necessary to state, that I fully concede, what I regard as fully settled by, the case referred to 1 *Har. & John.* (and before that decision, I do not see how any doubt could have existed upon the subject) that by the attachment laws of Maryland, "where the garnishee is indebted to the defendant, by a promissory note, and an attachment is laid in his hands before such note is passed away by the defendant, whether it be before or after it is due, it is a lien on the amount of the note." This is all that was established by the case of *Stewart vs. West,* as stated by the reporter in his synopsis thereof. But in making that concession, I, by no means admit, that if subsequently to the service of the attachment, and before the note becomes due, it be endorsed in blank, or made payable to bearer, and be negotiated in the due course of business to a *bona fide* transferree for

value and without notice, that the lien is not thereby lost, and the title of the transferree, in virtue of the law-merchant, become absolute and indefeasible, and discharged from the lien. The facts in proof in the case of *Stewart* and *West* raised no such questions, and consequently by no legitimate inference can it be assumed, that the General Court determined or designed to determine, any such question. The case of *Stewart vs. West* is most briefly reported, without any opinion of the court, or argument of the counsel, from which it can be inferred that the court did any thing more than decide the prayer in reference to that state of facts only, which were in proof in the cause. Let us examine what those facts were, and we at once perceive all that the General Court meant to decide.

*Stewart vs. West* was an appeal from *Prince George's* county court, in which it appeared, that the appellant, on the 14th of June, 1800, issued out of the said court, on a judgment therein, in which he was plaintiff, and *Jenners* defendant, an attachment, which on the 15th June, 1800, was laid in the hands of *West*, who appeared, and pleaded *nulla bona.*

At the trial, the defendant produced and read in evidence the following promissory note:

" Sixty days after date, I promise to pay *Mr. Abiel Jenners*, or order, one hundred dollars, negotiable at the *Bank of Columbia*, for value received.        *Stephen West.*"

And proved the signature of *Abiel Jenners* to the following endorsement thereon, viz:

"For value received, I do hereby assign over all my right, title and interest to the within note, to *Col. Solomon Simpson,* this 18th of April, 1800.        *Abiel Jenners.*"

There was also endorsed upon the note:

" *Mr. West.* Sir: Please to pay the within to the bearer.
                    *Solomon Simpson.*"

But no evidence was adduced of the signature of *Solomon Simpson:* nor was there any proof by the defendant, except the said endorsement signed by *Jenners,* that the note had ever been negotiated to any person, or that he received any consideration or value for the said endorsement, or under what

circumstances it was made, or that it was ever delivered to *Solomon Simpson* or any other person other than *West* himself. And upon this proof of the defendant rested his case.

The plaintiff then proved by a witness that the note was passed to him by *Abiel Jenners*, as the owner thereof, whether before or after it became due he did not recollect; but if before it became due, it was but a few days; that it was after it became due that he presented it to *West* for payment; that he held said note from five to ten days before he presented it to *West*. Upon the proof thus offered, the case was submitted to the jury, with the following prayer to the court by the plaintiff:

" That if they were of opinion from the evidence offered, that the above mentioned promissory note was in the hands of said *Abiel Jenners*, as the owner thereof, at or after the time when the attachment in this case was laid in the hands of *West*, the garnishee, that then the attachment was a lien, and bound whatever money was due on the note from *West*, in the hands of *West*."

The prayer being refused on an equal division of the court, on an appeal to the General Court, the judgment of the county court was reversed. And of the propriety of such reversal I can see nothing to induce me to entertain a momentary doubt. To transfer to an endorsee or transferree of the character hereinbefore described, such a paramount title to the note as will over-ride and defeat, according to the law-merchant, all prior equities, liens and rights of property in the note, the endorsement or transfer, must be supported by a delivery of the note.

In the case of *Stewart vs. Jenners*, there was not a particle of proof, direct or inferential, from which the jury could find the fact of such delivery, and, of consequence, the lien created by the attachment standing unaffected by the alleged endorsement to *Col. Simpson*, the prayer of the plaintiff ought to have been granted by the county court, and for its failure to do so, its judgment could not be otherwise than reversed by the General Court. So far from its appearing that the note, under the endorsement thereon, was ever delivered to, or put in possession of *Col. Simpson*, the alleged endorser, the testimony

on the part of the plaintiff clearly showed, either that the endorsement was a fabrication, or if *bona fide,* and the delivery of the note accompanied it, that it afterwards came into the possession of *Abiel Jenners,* "as the owner thereof," and was by him negotiated to the witness. But such negotiation being unsustained by any consideration therefor, the witness held the note subject to the same lien by the attachment, to which it was obnoxious in the hands of *Abiel Jenners.* The assertion then, that the principle has been settled by a judicial decision of the late General Court, that in a case like that now before us, the lien of the attachment has priority over the rights of a transferree of the note, in the condition of the present appellee, is not established by the authority relied on for that purpose.

And after a careful examination of all the cases from other of the *United States,* which in the argument of this cause, have been confidently relied on for the establishment of such a principle in *Maryland,* my mind has been irresistibly brought to the conclusion, that there is not one of them entitled to the weight of a feather for such a purpose.

The first of those cases was *Coit against Hull, Kirby's Rep.* 149. That case gave not the slightest colour to the principle now sought to be sustained by it. The question now before us does not appear to have been presented in that case. The plea that was demurred to did not show that the note was payable on time ; that it was not due at the time of the subsequent transfer; that it was not overdue at the time the attachment was laid ; and it was at that time, and in that case, denied that promissory notes were transferrable in that State.

The next case was that of *Huff vs. Mills,* 7 *Yerger,* 42, the principles of which decision rather militate against, than for the appellant here, as will appear by the synopsis of the case, which is as follows :

" A debt secured by a negotiable paper, upon which suit has been brought, may be attached in the hands of a garnishee. The answer of the garnishee is conclusive as to his liability. If a garnishee state that he executed a negotiable note or bill

single, but did not know who holds it, or whether it be assigned or not, he does not state that he is indebted to the debtor of the attaching creditor, and no judgment can be given against him. But when the garnishee states he executed the note, that it has been sued on, and that there is no judgment on it, he is liable as a garnishee, and judgment must be entered against him as such."

In this case the note was already due, and suit brought thereon by the payee, before the attachment issued, and it was in reference to such cases that the court were speaking. Where a garnishee has not been called on to answer interrogatories, to entitle the attaching creditor to a judgment, he must prove the existence of the same facts, which would have secured him a judgment, had they appeared in the response of the garnishee.

The next case relied on by the appellant is that of *Scott and Rule vs. Hill and McGunnegle*, 3 *Missouri Rep.* 88, which, if construed without reference to any other judicial decisions of that State, or the statutes thereof, would be a direct authority in favor of the doctrine contended for by the appellant. But it is only necessary to refer to the case of *Bates vs. Martin* in the same book, page 367, to discover that the law-merchant and the statute of 3 and 4 *Anne*, in regard to promissory notes, as adopted and prevailing in *Maryland*, have not been adopted and do not prevail in *Missouri;* but that, by the statutory enactments of that State, there exists there a peculiar law-merchant in relation to promissory notes, bonds, &c., (all of which stand on the same footing,) wholly dissimilar to that prevailing in *England* and in *Maryland*, and which has prevailed and been practised under, ever since the 3 and 4 of *Anne*.

In conformity to this peculiar and anomalous statute law of the *State of Missouri*, was the case of *Scott and Rule vs. Hill and McGunnegle* decided; and therefore, it has no application whatever to the case now before us. And if further authority on the subject were necessary, it is found in the case of *Rector, &c. vs. Honore, &c.*, 1 *Missouri Rep.* 204, where it was expressly declared that the statute of *Anne* is not in force in *Missouri*.

The next case referred to, and strongly relied on, in the argument of this case, as of controlling authority, is the case of *Dore vs. Dawson*, 6 *Alabama Rep.* 712, which certainly would be a decision, in favor of the appellant and directly in point, if it had been made under the same principles of commercial law, in reference to promissory notes, that have always prevailed in *England* and in this State, since the passage of the statute of 3 and 4 *Anne.* But that no such principles of commercial law exist in *Alabama*, is conclusively demonstrated in the same volume of the *Alabama Reports*, page 156, in the case of *Beal and Bennett vs. Wainwright, Shields & Co.*, and therefore the case of *Dore vs. Dawson* has not the semblance of authority on the question to be adjudicated in the present appeal. The case of *Dore vs. Dawson* was determined upon the particular statute of *Alabama*, which may be found in 9 *Porter's Rep.* 447–8, *Smith vs. Strader, Perine & Co.*, and gives a qualified negotiable character to promissory notes, and "all bonds, obligations, bills single, bills, and all other writings for the payment of money or any other thing." But this statute expressly provides, that "in all actions to be commenced and sued upon any such assigned bond, obligation, bill single, promissory note, or other writing as aforesaid, the defendant shall be allowed the benefit of all payments, discounts and sets-off, made, had or possessed as against the same, previous to notice of the assignment, in the same manner as if the same had been sued and prosecuted by the obligee or payee therein."

The next case on which the appellant relied, was that of *Williamson et al. vs. Bowie*, 6 *Munford's Rep.* 176. This case has nothing to do with the principle now in question before us; and if any analogous question were there decided, it could be of no authority in this State, because the law-merchant, as to promissory notes, under the statute of *Anne*, is not recognized in *Virginia.* See the case of *Stewart vs. Anders*, 6 *Cranch*, 203.

The case of *Chase et al. vs. Houghton et al.* 16 *Vermont Rep.* 594, was also relied on, in the argument for the appellant. But the slightest examination of that case must satisfy

anybody that it can have no weight in the decision of the case now before us; because it appeared at the trial, on the trustee's process, not, as here, that the note, before its maturity, had been transferred to a *bona fide* holder for value ; but that it was the property of the payee at the time it was due; and that a suit was then pending in his name against the garnishees for the recovery thereof.

The only remaining case which was referred to and relied on by the appellant in reference to the question now under consideration was the case of *Hull vs. Blake*, 13 *Mass. Rep.* 153, which cannot have the slightest influence upon the case before us, until all the principles of the law-merchant, in relation to promissory notes which have prevailed in *Maryland* from the time of the passage of the 3 and 4 of *Anne* to the present time, shall be annulled or repealed. All that was decided by the Supreme Court of *Massachusetts* in *Hull vs. Blake* was, that a court in *Georgia*, on promissory notes given in that State, having determined that in an action of debt by one of his creditors against the payee of the notes, by summoning as garnishee the maker of the notes, a recovery could be had against him of the amount of such notes, although the notes, previous to the commencement of such action of debt, and before the notes became due, may have been *bona fide*, and for value transferred to an endorsee, the court in *Massachusetts* were bound to assume that the judgment of the court in *Georgia* was conformable to the laws of that State. The propriety of such a decision, it appears to me, cannot for a moment be doubted. The notes there in question being *Georgia* contracts, must, in their construction and operation be governed by the laws of *Georgia*, which laws in reference to those contracts, having been adjudicated by a court in *Georgia* of competent jurisdiction, upon every principle of judicial comity, was the court of *Massachusetts* bound to give efficacy to those contracts in subjection and conformity to the judicial proceedings of the court in *Georgia*. In other words, the court in *Massachusetts* in respect to the case before it, could not do otherwise than assume, that, in the State of *Georgia*,

promissory notes were not subject to the law-merchant, as established by the statute of *Anne.* What possible relevancy or influence can the decision of the court in *Massachusetts* in the case of *Hull vs. Blake* have upon the case now submitted to our determination? Are we justified or required by it, in construing a *Maryland* contract, between *Maryland* parties litigant, contrary to our undoubted knowledge upon the subject, and the numerous decisions of this court, and indeed of every court of law and equity in the State, to assume that the law-merchant, as to promissory notes as established by the statute of *Anne*, has never been adopted in this State? If the decision of the Supreme Court of *Massachusetts* in the case of *Hull and Blake*, does not involve us in such an assumption, it has not the shadow of an analogy to the case before us, and cannot have the slightest bearing upon it. That the decision of the court in *Georgia*, could be for a moment sustained in *Maryland*, nobody would contend.

It has been suggested that in analogy to the court's decision in *Hull vs. Blake*, this court ought to regard the question now under our consideration, as correctly decided, and settled by the alleged decision of *Baltimore* county court in the case of the *Bank of New Orleans vs. Rebecca Somerville and Tiernan Somerville.* This suggestion is unquestionably entitled to the merit of peculiar novelty. If an adjudication, at *nisi prius*, by the two Associate Judges of *Baltimore* county court (they only having sat in the case of the *Bank of New Orleans vs. Somerville*,) is to be forever conclusive in all future cases, as to all questions of law by them decided, it is difficult to assign a satisfactory reason, why a Court of Appeals should longer continue a part of the judicial system of the State; being thus rendered an useless burden upon the community. But it is somewhat remarkable, that it did not occur to the suggester of this innovation, that the principles of law, determined in the *nisi prius* case, to which such deferential submission is required, have been over-ruled by the judgment of *Baltimore* county court now for review before us. And that such over-ruling was not only the act of the two Associate Judges of that

court, but was the result of the unanimous opinion of the three Judges thereof; the chief of whom is also the Chief Judge of the Court of Appeals of *Maryland.*    But there is another reason why I cannot yield submission to the conclusiveness of this venerated *nisi prius* judgment; which is, that no such question as that now before us, was submitted in that case, to the decision of the county court, or was decided by it; on the contrary, the judgment was entered in pursuance of a written compromise or arrangement between the parties themselves, in relation to which the court had no agency.

It was urged that as promissory notes given in violation of the statute of gaming and usury, no matter into whose hands they may pass, are irrecoverable, and of no validity, that the same principle should be applied to the note before us.    But I can discover no analogy between the two cases.    The statutes against gaming and usury, declare all notes given for gaming or usurious transactions, to be absolutely null and void, without any reservation, either express or to be implied of the rights of any person, who, under any circumstances, may become the holder thereof.    In conformity with the positive language of these enactments, and from motives of public policy, and with a view to restrain two great and increasing vices which threatened, as was believed, to overwhelm the morality and prosperity of the nation, it was decided by the courts of *England* (and those decisions have followed by the judicial tribunals of this State and elsewhere,) that it was the design of the Legislature that the statutes against gaming and usury should be paramount, and control the law-merchant as to promissory notes issued in violation of them, but even with such high motives for its adoption, this innovation upon the law-merchant has been regretted, if not condemned by many of the most distinguished jurists of *England.*    Can ingenuity itself, upon any sound principle of construction, assimilate the cases which have been adjudicated under the statutes of usury and gaming, to the case before us, under the attachment law of *Maryland?*    I respectfully believe that it cannot.

On the part of the appellee, but two authorities were referred

to. The first was *Sergeant on Attachment*, pages 85–86, which in the most explicit manner sustains the decision of *Baltimore* county court, on the identical question now before us.

The second authority is that of *Ludlow vs. Bingham*, 4 *Dallas*, 47. This case, decided in the High Court of Errors and Appeals of *Pennsylvania*, by the unanimous opinion of that court, delivered by that distinguished jurist, *Thomas McKean*, then the Chief Justice thereof, after a most thorough and elaborate argument by the most eminent lawyers of the State, (one of whom was *E. Tilghman*, the late Chief Justice of that State,) is to my mind conclusive upon the case before us. The principle there determined, was identical with that to be decided in this case, with this difference only, that in the case in *Pennsylvania*, it was conceded by the counsel sustaining the efficacy of the attachment, (of whom *E. Tilghman* was one,) that if the law-merchant of *England*, in relation to promissory notes (which is undeniably the law of *Maryland*,) had been the law of *Pennsylvania*, the attachment laid in that case could have interposed no barrier to the subsequent *bona fide* holder of the note for value. And the only ground upon which they resisted such holder's right of recovery was, that their statute law upon the subject was different from the commercial law of *England* and *New York*. In the argument of the case before us, the learned counsel for the appellant has not even intimated that the law-merchant of *England*, as to promissory notes, is not the law of *Maryland*.

After a careful examination and mature consideration of all the cases referred to in the argument upon the case before us, I have not been able to discover even a dictum, when properly understood, much less an adjudication, in the slightest degree conflicting with the decision of the court below in this case; or with that of *Ludlow vs. Bingham*, as far as the present controversy is concerned.

Being unable to doubt for an instant, the correctness of the county court's refusal of the second prayer of the appellant, which is the only question before us on the present appeal, I think its judgment ought to be affirmed.

CHAMBERS, J., delivered the opinion of this court.

This was an action of *indebitatus assumpsit*, with the usual money counts. The general issue, *non assumpsit*, was pleaded.

There is no difficulty made in regard to the pleadings. At the trial the appellee, the plaintiff below, offered in evidence a promissory note, made by the appellant, the defendant, on the 1st November, 1841, for $822 19, payable in two years after date to *W. T. Somerville*, or order, and by him endorsed, payable to appellee, or order.

The defences set up were *first*: a verdict and judgment of condemnation in *Baltimore* county court, on the 27th January, 1843, against the appellant, and *W. T. Somerville*, as garnishees of *Charles Tiernan*, surviving partner of *Luke Tiernan & Sons*, in favor of the *Bank of New Orleans*, by which judgment it was alleged the money or debt sued for in this action was condemned in the hands of the appellant, and made liable to the *Bank*, the plaintiff in that action.

And *secondly*, the application of said *Charles Tiernan* for the benefit of the insolvent laws of the State, on the 14th June, 1842, and his subsequent discharge, pursuant to said insolvent laws.

At the trial the defendant offered the record of the verdict, and judgment of condemnation thereon, in the case of the *Bank of New Orleans* against her, by which it appears the attachment was issued on the 10th January, 1842, to which she appeared, and in March, 1842, pleaded *nulla bona*, on which plea issue was joined, and verdict and judgment rendered 27th January, 1843, for plaintiff, for the following sums, to wit: $500 to be paid 1st May, 1843. $500 on the 1st November, 1843. $822 19 on the 1st May, 1844. $1,000 on the 1st November, 1844. $1,000 on the 1st November, 1845. $1,000 on the 1st November, 1846, and $2,000 on the 1st November, 1847: making an aggregate sum of $6,822 19.

In reference to this ground of defence, parol testimony was also taken.

*Charles Tiernan* was produced as a witness by the plaintiff, and objected to as incompetent; but that objection is understood

to be now waived and properly so. His testimony, as stated, is singularly cloudy. It is "that he came to a settlement with the appellant in October, 1841, of a debt due to *Luke Tiernan & Sons,* and then (in October,) took her notes for $5,000, payable annually from 1 November, 1841, in the sums of $1,000 each, that the first of these notes some time before" (before when not being stated) he transferred to his brother *William,* to secure a debt of $453 due him, and a sum due *W. Cooney,* and $100 due by deponent to *J. Nelson, Esq.* as a fee—which when said note fell due, was paid by *Tiernan Somerville* to said *Nelson ;* and this note is a renewal in part of that $1000 note, though dated 1 November, 1841; and that the other of said notes were passed to *Thomas Penny.*

The defendant proved that counsel for the garnishee appeared in the attachment suit by direction of *Charles Tiernan,* and the counsel proved he had no recollection of being informed by *Charles Tiernan* that he had passed away the notes; but that *Tiernan* set up the defence that the notes *were given* to him in a different character from that in which the attachment was levied.

To sustain the *second* ground of defence, the defendant offered the record containing the petition of said *C. T.,* and the schedule and other proceedings in insolvency, and proved "that the debt now sought to be recovered, was part of the debt stated in said schedule."

On this state of facts, the court below was asked to instruct the jury that if they should believe *Charles Tiernan,* at the time the attachment issued, and when he applied for the benefit of the insolvent laws, was the holder of the note sued on, then the plaintiff was not entitled to recover; and it is the duty of this court to determine whether that court was in error for refusing to give such instructions.

The questions then are broadly presented, whether an attachment laid in the hands of the maker of a promissory note as garnishee, for the debt of an endorsee, then being the owner and holder of the note, and a judgment of condemnation on the attachment, will protect the maker garnishee in a subsequent

action brought on the same note, by a subsequent endorsee receiving the note without notice. A preliminary proposition was argued by the appellee's counsel, which cannot be sustained, to wit: that there was no evidence which the jury could respect to prove the fact of the notes being in the hands of *Charles Tiernan* at the time of the attachment. It is emphatically stated, "the defendant proved the debt now sought to be recovered was part of the debt stated in said schedule" of *Charles Tiernan*, and the testimony of *Charles Tiernan* and *Mr. Bradford* would seem to establish that the note was originally taken by *Charles Tiernan* for himself or his firm. If in his possession at the moment it was made, and was found also in his possession 14th June, 1842, the date of his petition, more than six months after its date, being five months after the attachment, it would be not only sufficient to go to the jury, but appear to be conclusive in the absence of any clear and satisfactory account of the time and circumstances of its intermediate disposition, and this without reference to what has been proved by *Mr. Bradford*, as to his being engaged by *Charles Tiernan* to defend this suit of the attaching creditor, and the exclusive ground of resistance on which he relied.

The most alarming consequences to all commercial transactions, and all commercial men, have been presented in the most glowing terms, as the inevitable result of a decision by this court, that a negotiable instrument can be attached in the hands of the maker. In a case of first impression, depending on a statute, of which the language was capable of a construction, which might avoid embarrassment to the commercial or any other portion of the community, undoubtedly the argument of inconvenience would justly have controlling influence. But this is neither a case *primæ impressionis*, nor is the statute which governs it capable of a construction, such as is proposed. Its terms are, that a creditor in certain conditions may attach " the lands, tenements, goods, chattels and credits of his debtor." See act of 1796, ch. 56. And another part of the act speaks of the liability of a garnishee who "is *indebted* in *any* sum of money." It also requires the garnishee to answer upon oath

such interrogatories as may be propounded by the creditor, touching the particulars of his indebtedness, and on failure to answer, the court is to adjudge him indebted to an amount sufficient to pay the debt. And this was but a repetition in respect to the subject of the attachment of the act which had been in force since 1715, by which attachments were authorized against all goods, chattels and credits in the hands of any person whatsoever; yea, even in the plaintiff's own hand, "adding to goods, chattels and credits;" also "lands," which first by construction of the statute of 5 *Geo.* 2. ch. 7; and afterwards by our own legislation, had become liable to be seized, and sold by *fieri facias*, in the same manner as personal property. Certainly the Legislature of this State in 1795, when they deliberately re-enacted these provisions, and made them apply to cases not within the act of 1715, were not uninformed of the general principles of commercial law, which governed negotiable paper. The statute of 3 and 4 *Anne*, ch. 9, making promissory notes negotiable, was introduced at an any early period into the Colony: and in a very few years after its enactment, we have on our own statute book the legislation which was had to aid and promote the law-merchant in respect to protested bills of exchange. See act of 1715, ch. 7. It is happily true that the commercial operations of our citizens have been greatly enlarged since that period; but still, the attachment law has remained without repeal or restriction: on the contrary, many other later, and some very recent statutes have extended the application of this remedy, specially provided the form of proceeding, and defined the parties for and against whom, and the authority or tribunals by which it may be used. In addition to this, it is found that as long since as in 1804, it was expressly decided in the General Court, where all the distinguished members of the bar from all parts of the State assembled, that a creditor may attach a promissory note in the hands of the maker, whether before or after due, and arrest its negotiability. The decision thus made near half a century since, has been published in the reports of *Maryland* decisions since 1821. See 1 *Har. & John.* 536, *Stewart & West.* During this whole period, there is no

one item of complaint evidenced in either the legislative or judicial history of the State, or indeed in any other department.

This apparently long settled opinion on the plain words of a statute would require the court to hesitate much before it would be resisted, even if all the consequential inconvenience were to result from adherence to the rule, and none from abandoning it. But such is not the case. The result of a contrary doctrine would illy harmonize with all the legislation which has designed to place every species of property at the control of an honest creditor. Would it be no matter of just complaint that a debtor shall avowedly have thousands distributed in the hands of persons of undoubted ability, in the immediate vicinity of the creditor, who yet is denied any legal means to procure any portion of these sums, because his debtor has his large means in the form of negotiable paper? Certainly such funds could not be be reached by any process of execution, and except by attachment, *must* be unavailing to the creditor. Our whole system regulating the relation of debtor and creditor is designed to subject every dollar's worth of property, real, personal and mixed, to the just claims of a creditor, and to exempt the honest debtor who does surrender all such property from the grasp of a relentless creditor, who might desire to imprison his person, or weigh down his future energies by the impending burden of his debt. It is not peculiar to our own State that the rule is not universal, which gives to the *bona fide* endorsee of a promissory note or bill of exchange, without notice, entire exemption from all defences which might be used against parties to the note, or subsequent holders, with notice. The *English* statutes of usury and gaming show their opinion that other considerations are quite as deserving of notice as the inviolability of the rule of the law-merchant in this respect, and sufficiently important to the community to create certain exceptions to that rule. These exceptions arise under circumstances which are beyond the knowledge of the parties affected by them, and in no respect does the paper on its face indicate its liability to exception. It will not do to say remote parties may enquire of those immediately concerned in the paper at its inception.

That answer meets all the difficulty arising from the effect claimed for the attachment, precisely to the same extent as when the negotiability of the paper is arrested or destroyed by usury, gaming or any other cause. The facts are as open to inquiry in one case as in the other. Other States in the Union have found it very practicable to conduct their business operations with similar restrictions upon this commercial rule. We find that attachment process, or as it is termed in some of the States, "trustee process," has been adjudged available to secure the debt in the hands of the maker of the note as garnishee, and arrest the negotiability of the note.

The case of *Chase & Haughton*, 16 *Verm.* 594, is a strong case full to the point. That was a negotiable instrument due to a resident of *Massachusetts*, where, by the express terms of a statute, negotiable paper is secured against such process. But as the contract was made in *Vermont*, and on its face required to be also executed there, the court held the maker liable to the process, and before the maturity of the note, on the words of their statute, which declared persons having the "goods, effects or credits" of the debtors, liable. It would seem from *Kirby's Rep.* 149, *Coit & Bull*, that such had long been the law of *Connecticut*.

The same doctrine seems to prevail in *Georgia, Tennessee, Alabama* and *Missouri*. See 13 *Mas.* 153 *Hull and Blake.* 7 *Geiger*, 42. *Huff and Mills*, 6 *Alab. Rep.* 712. *Dorr and Dawson*, 3 *Miso. Rep.* 88. *Scott and Hill.*

It has been intimated that the statutes of these States, in terms, allow any equitable defence to be made against an endorsee, which could be made against the original party, the payee. But it must be seen, that this rather more strongly makes against the position we combat. The argument is, be it remembered, that the alarming consequences to the mercantile world must coerce us to construe our statute directly in violation of its plain language and its apparent design. Not an authority is produced for the appellee, in the shape of a decision or *dictum*.

The entire derangement of all transactions by the medium of

negotiable instruments, is involved, it is said, in allowing their negotiability to be arrested by setting up their defence against an endorsee, without notice. It is no consistent answer then, when it is said such a defence can be made in *Alabama*, and no such derangement has been experienced, to reply that there they allow not only this, but any other equitable defence. It is calculated to prove that commercial operations will progress with even greater impediments than those imposed by our attachment laws.

It cannot be required the payee should insist on the production of the note, that its future negotiation might be restrained. The most usual case of attachment is where the holder of the note, the party whose credit is attached, is beyond the jurisdiction of the court—out of the State—of course, making any attempt to coerce an order upon him impotent. It is not, however, to be lost sight of, that in this case, the question is not made in the progress of the attachment cause, but the court having competent jurisdiction, has, in opposition to the efforts of the party now appellant, recognized the right of the attaching creditor to recover, and he has recovered after every means of resistance. The appellant having been thus unwillingly coerced to pay the note once by the judgment of the court now, when sued for the same debt by a party claiming under the same individual, on whose account and as garnishee for whom she paid it before, is told that she must pay it again. To suffer such injustice under the sanction of judicial proceeding, would be more justly the subject of complaint, than the imputed derangement of mercantile securities. In *Massachusetts*, where, as before said, they forbid the attachment of negotiable instruments, they have yet decided that where a court of competent jurisdiction, even in another State, has condemned the debt in the hands of a garnishee, they must respect such decision and receive it as full defence to a subsequent action on the same instrument. 13 *Mass.* 153, *Hull and Blake.* Surely we should pay as much courtesy and respect to our own courts, as is due from those of different States to each other.

We think on each of the grounds discussed, the court below

was in error in deciding the defence not tenable upon the record in the attachment case, entertaining the opinion, as we do, that a promissory note or bill of exchange is a credit in the view of the attachment laws, and that the former judgment was by a court of competent jurisdiction on the same matter, and conclusive between the parties.

With regard to the other ground of defence, the insolvency of the holder of the note, and the legal transfer thereby of his title to his trustee, it is deemed unnecessary to enter upon an argument in detail.

The general views taken in the case of *Alexander vs. Ghiselin* at the present term, as to the construction of the insolvent laws, and the devolution upon the trustee of the title of the insolvent to every species of property, will leave no room to except negotiable instruments, except the considerations of inconvenience, which have already been fully discussed. It is our opinion that the insolvency of the holder of a note or bill of exchange passes the title thereto to his trustee, and disables the insolvent from conveying an interest in the bill or note, after the date of his personal discharge, even to an endorsee, without notice of his insolvency.

In this opinion we are pleased to find ourselves sustained by the high authority of *Chief Justice Parsons*, and the other Justices of the Supreme Court of *Massachusetts*, in the case of *Baker vs. Wheaton*, 5 *Mass. Rep.* 509. The Chief Justice says, " where the note is discharged by the insolvent laws of the State," (both parties there being citizens, and bound by the operation of those laws,) " the contract no longer exists, and a subsequent endorsement is void, because there is nothing to pass by the assignment."

If, therefore, the defence upon the former recovery had been out of the way, the insolvency of the holder of the note should have availed.

**JUDGMENT REVERSED AND PROCEDENDO AWARDED.**